CUPPETT & WEEKS NURSING HOME, INC. *v.*
DEPARTMENT OF HEALTH AND MENTAL HYGIENE

[No. 1564, September Term, 1980.]

*Decided June 8, 1981.*

The cause was argued before MOYLAN, LOWE and COUCH, JJ.

*Ransom J. Davis* and *Jack R. Turney,* with whom was *H. Russell Smouse* on the brief, for appellant.

*Stephen J. Sfekas, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General of Maryland,* on the brief, for appellee.

COUCH, J., delivered the opinion of the Court.

The appellant, Cuppett & Weeks Nursing Home, Inc., sought reimbursement for certain expenses it had incurred as a participant in Maryland's Medicaid Program.[1] In administrative proceedings the State Department of Health and Mental Hygiene (the Department) denied the requested reimbursement, which denial was subsequently affirmed by the Department's Board of Review. An appeal was thereafter taken by Cuppett & Weeks to the Circuit Court for Garrett County, which sustained the decision of the Board of Review. This appeal ensued.

For the reasons set forth in this opinion, we hold that the circuit court was not in error in sustaining the decision of the Board of Review. Thus, we affirm the Order of the circuit court.

## The Facts

By a deed dated September 18, 1959 certain real property in Garrett County was transferred to Graham Weeks, his wife, Mary Weeks, and his mother, Bessie Cuppett. These persons established the Cuppett & Weeks Nursing Home Partnership (the Partnership) in 1960, and operated the nursing home facility which improved the real property. At

---

*Note: *Certiorari* denied, Court of Appeals of Maryland, September 9, 1981.

1. Md. Ann. Code art. 43, §§ 42-42N.

that time Bessie Cuppett had a fifty percent interest in the Partnership; Graham and Mary Weeks together shared the remaining fifty percent interest.

Based on the advice of their accountant, the partners in 1967 formed the Cuppett & Weeks Nursing Home, Inc. (the Corporation). The Corporation managed the nursing home, and leased that facility from the Partnership. The original incorporators owned stock in the following amounts:

| Bessie Cuppett | 19 shares |
| Graham Weeks | 21 shares |
| Robert Weeks | 19 shares |

In 1969, Robert Weeks, another son of Bessie Cuppett and the brother of Graham Weeks, became a member of the Partnership. According to the terms of an agreement executed on April 11, 1969 the capital was divided in the following proportions:

| Bessie Cuppett | $255,849.34 | 45.62% |
| Graham Weeks | $274,979.96 | 49.02% |
| Robert Weeks | $30,074.37 | 5.36% |

The agreement further specified that the partners had equal rights in the management of the Partnership business.

In 1971 Graham Weeks withdrew from the Corporation by selling his stock. These shares were bought by other members of the family. Stock was obtained by Thomas Cuppett, another son of Bessie Cuppett; Frances Birge, daughter of Bessie Cuppett; and Jerry Meyers, husband of Bessie Cuppett's daughter, Carolyn Meyers. At this time Graham Weeks transferred to Robert Weeks the role of Corporation Administrator.

After the withdrawal of Graham Weeks, and following additional transactions, ownership of the corporate stock was divided among six persons, as follows:

| Bessie F. Cuppett | 19 shares | 32% |
| Robert Weeks | 8 shares | 13.56% |
| Thomas Cuppett | 8 shares | 13.56% |

| James Cuppett | 8 shares | 13.56% |
| Frances Birge | 8 shares | 13.56% |
| Jerry Meyers | 8 shares | 13.56% [2] |

The Corporation continued to lease the facility and equipment from the Partnership. In 1971 a written lease covering the period July 1, 1971 through June 30, 1976 was executed, specifying the rental at $10,155.43 per month for the 155 bed facility, or approximately $721 per bed annually. An expert appraiser engaged by the Corporation in November of 1971, appraised the fair rental value of the facility at $600 per bed annually.

Effective in March of 1974, the total rental payment was increased to $10,409.31 per month. Bessie Cuppett signed the appropriate addendum to the lease on behalf of the lessee Corporation. Graham Weeks signed the addendum on behalf of the lessor Partnership.

As a "provider of service," certified to care for patients under the Medicaid program, the Corporation received interim reimbursement for the cost of providing care for Medicaid recipients. Among the expenses obtained by the Corporation as reimbursement were the following rental expenses paid to the Partnership for the years 1970 through 1975:

| 1970 | $111,000.00 |
| 1971 | $102,000.00 |
| 1972 | $106,415.00 |
| 1973 | $121,865.00 |
| 1974 | $122,881.00 |
| 1975 | $124,912.00 |

Based on audits conducted by a private contractor, the Hospital Cost Analysis Service, Inc. (HCAS), the Department determined that the Corporation was not entitled to the amounts sought. Specifically, the HCAS reviewed the lease agreement, the tax returns and the records of the Part-

2. The record and both parties refer to these percentages, which by rounding total only 99.8%.

nership and the Corporation, and then determined that the Partnership and the Corporation were "related organizations" within the meaning of the applicable Medicaid regulations.[3]

By this determination, the Corporation was deemed entitled to reimbursement only for the ownership costs incurred by the Partnership, rather than for the rental expenses as submitted to the Department. These ownership costs included depreciation, amortization of interest incurred during construction, mortgage interest, interest on demand notes, property taxes, insurance and accounting expenses, repairs, and miscellaneous interests, amounting to:

| | |
|---|---|
| 1970 | $60,875.00 |
| 1971 | $57,893.00 |
| 1972 | $66,847.00 |
| 1973 | $67,782.00 |
| 1974 | $65,226.00 |
| 1975 | $62,239.00 |

The disallowance of the submitted rental expense meant that the Corporation owed the State the difference between the rent paid to the Partnership and the Partnership's ownership costs. To arrange a final cost settlement the Department sought the amount of the alleged overpayment, and the Corporation sought full reimbursement of the submitted costs.

An administrative hearing on the controversy was held initially on May 20, 1977 before a hearing officer on behalf of the Department and then was resumed and concluded on July 8, 1977 before the same presiding officer. Based upon his proposed findings of fact and conclusions of law, the Secretary of Health and Mental Hygiene on January 27, 1978 entered an order which affirmed the determination of the Department's Medical Care Programs unit that the Corporation and the Partnership were related organizations.

---

3. 20 C.F.R. 405.427; COMAR 10.19.10.07C (1) (a).

The Board of Review of the Department of Health and Mental Hygiene, after a hearing on June 1, 1978, entered an order on August 10, 1978 which affirmed the decision of the Secretary.

By Petition and Order of Appeal filed in the Circuit Court for Garrett County, the Corporation sought judicial review of the ruling by the Department's Board of Review. After submission of memoranda setting forth the respective positions of the parties, and oral argument of counsel, the circuit court on October 17, 1980 rendered an Opinion and Order which sustained the decision of the Board of Review.

From the Order of October 17, 1980, the Corporation appeals, asking:

I. Whether the Corporation and the Partnership are correctly considered as "related organizations" within the meaning of the applicable regulations of the Maryland Medicaid Program?

II. Whether the Medicaid regulations which prohibit reimbursement of any rental expense incurred by a provider to a related organization create an irrebuttable presumption in violation of constitutional due process of law and equal protection of the laws or are repugnant to the statutory purpose of reimbursing providers for their actual costs?

III. Whether the doctrine of equitable estoppel or the corollary doctrine of laches are applicable to preclude recovery by the State of monies paid to Appellant as reimbursement of rental expenses?

From our examination of the record and the applicable law we are persuaded that the Corporation and the Partnership were properly determined to be "related organizations," that the Medicaid regulations are neither unconstitutional nor repugnant to any statutory purpose, and that the equitable doctrines do not apply to the present case.

*The Law and its Application*

The Department is authorized by statute to "establish rules and regulations for the reimbursement of providers under the Maryland Medical Assistance Program", Md. Ann. Code art. 43, § 42 B. Pursuant to this grant of authority, the Department's Medicaid regulations expressly adopt the reimbursement principles of the Medicare program:

> Allowable costs shall be determined based upon Medicare publications, entitled Health Insurance Regulations (HIRM-1) and Provider Reimbursement Manual (HIM-15) unless otherwise specified by these regulations.
>
> COMAR 10.09.10.09A (1) (a).

Included in these regulations governing allowable costs is the related organizations regulation at issue in this case. The regulation specifically recognizes that:

> Individuals and organizations associate with others for various reasons and by various means. Some deem it appropriate to do so to assure a steady flow of supplies or services, to reduce competition, to gain a tax advantage, to extend influence, and for other reasons. These goals may be accomplished by means of ownership or control, by financial assistance, by management assistance, and other ways.
>
> 20 C.F.R. 405.427 (c) (1).

Thus, the regulation recognizes that individuals may have perfectly valid and legitimate business reasons for associating with an organization related by common ownership or control. It is not the motivation for the relationship which is determinative, but its practical effect:

> Where the provider obtains items of services, facilities, or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, in effect, the items are obtained from itself. *An example would be a corporation building*

*a hospital or a nursing home and then leasing it to another corporation controlled by the owner.* Therefore, reimbursable cost should include the costs for these items at the cost to the supplying organization. 20 C.F.R. 405.427 (c) (2). (Emphasis added.)

The practical purpose of the regulation is "to prevent separate entities, which in fact function as a single entity, from each making a profit under the Medicaid program." *Schroeder Nursing Care, Inc. v. Mutual of Omaha Insurance Company*, 311 F. Supp. 405, 410 (E.D. Wis. 1970); *see also Medical Center of Independence v. Harris*, 628 F.2d 1113 (8th Cir. 1980).

The regulation is needed to prevent "double-dipping" from the Medicaid program, even when the individuals have perfectly legitimate motives for functioning as separate entities and even when there is no proof of an actual exercise of control by one entity over another. *Fairfax Hospital Association v. Matthews*, 459 F. Supp. 429 (E.D. Va. 1977) *aff'd sub. nom. Fairfax Hospital Association v. Califano*, 585 F.2d 602 (4th Cir. 1978). *See also Pasadena Hospital Association v. United States*, 618 F.2d 728, 732-34 (Ct. Cl. 1980); *Fallston General Hospital v. Harris*, 481 F. Supp. 1066 (D. Md. 1979) (secondary purpose of regulation is to define costs). Judge Bryan in *Fairfax Hospital Association* stated:

"The Court can think of nothing better than the regulations in question as a means to guard against double profit on those services, or 'sweetheart' contracts with suppliers, and the resulting increase of costs for those services beyond what is reasonable." 459 F. Supp. 429 at 433.

In the present case, the hearing officer and the Department found that the Partnership and the Corporation were "related organizations" within the meaning of 20 C.F.R. 405.427. This regulation states, in pertinent part, that:

"Costs applicable to services, facilities, and supplies, furnished to the provider by organizations

related to the provider by *common ownership or control* are includable in the allowable cost of the provider at the cost of the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere." (Emphasis added.)

The regulation establishes two independent tests for determining that two parties, in this case the owner of the facility and the lessee-provider, are related organizations. One test is common ownership and the other is common control. The Department found that, applying either the common ownership test or the control test, the Partnership and the Corporation were related organizations within the meaning of the regulation.

The Department's opinion specifically states that:

". . . Bessie Cuppett has about 45% interest in the supplier and a 32% interest in the provider; Robert Weeks has a 5.36% interest in the supplier and a 13.56% interest in the provider. No one else involved has an interest in both. No one individual owns greater than 50% in either the partnership or the corporation. The owners of the partnership and the stockholders in the corporation are all related by blood.

The combination of common ownership and the relationships of the persons involved indicate to me that there are individuals who do possess significant ownership in the supplier and provider."

On appeal, this Court will not substitute its judgment for that of the administrative agency, if the agency's determination is supported by sufficient evidence on the record. *Oxon Hill Recreation Club, Inc. v. Water Resources Administration,* 281 Md. 110, 375 A.2d 567 (1977).

After examination of the record and law we hold that ample evidence was presented to the Department to warrant its finding, and to have that finding sustained by the courts.

The appellant also challenges the constitutionality of the

"related organization" principle, contending that the application of this principle creates an irrebuttable presumption of wrongdoing on the part of related organizations. Federal courts have repeatedly upheld the Medicare and Medicaid regulations against this constitutional argument. *See Chelsea Community Hospital, Inc. v. Michigan Blue Cross,* 436 F. Supp. 1050 (E.D. Mich. 1977), and *Fairfax v. Califano, supra,* 585 F.2d 602.

Citing the reluctance of the U. S. Supreme Court in *Weinberger v. Salfi,* 422 U. S. 749 (1975), to sustain constitutional challenges under the "irrebuttable presumption rule," the Fourth Circuit Court in *Fairfax, supra,* concluded that the Medicaid regulations legitimately controlled excessive health care costs. Speaking for the court, circuit judge Donald Russell addressed the constitutional challenge to 20 C.F.R. 405.427 and stated:

> "Nor are we persuaded that the Regulation creates an unconstitutional irrebuttable presumption. The doctrine of impermissible irrebuttable or conclusive presumption has been justly criticized as of doubtful constitutional antecedents and of limited application. . . . In *Weinberger v. Salfi,* the Court after reviewing the authorities in which the doctrine had been cited, . . . then proceeded to dismiss the irrebuttable or conclusive presumption doctrine as entirely inapposite in reviewing for constitutionality statutes or regulations involved in 'social welfare legislation' and to reaffirm the rule in that area . . . [citations omitted] to wit: So long as a claimant for benefits or payments under a social welfare program is 'free to present evidence' that he is not disqualified under the test established by the statute or regulations, his only constitutional claim is that the test [he] cannot meet is not so rationally related to a legitimate legislative objective that it can be used to deprive [him] of benefits available to those who do satisfy that test." 585 F.2d at 609.

In the present case, sufficient evidence was presented to warrant application of the regulations, and to belie any claim that the regulation was being applied arbitrarily or capriciously.

Appellant's final contention is that the Department's delay in enforcing the regulations warrants application of the equitable estoppel doctrine to preclude such enforcement.

The general rule of estoppel as applied to the State is recited in *Salisbury Beauty Schools v. State Board of Cosmetologists,* 268 Md. 32, 63-67, 300 A.2d 367 (1973):

> "Although it is recognized that estoppel may operate against the state by acts done in its proprietary capacity, the doctrine of estoppel *will not be applied against the state in the performance of its governmental, public or sovereign capacity or in the enforcement of policy measures."* (Emphasis added).

The State's Medicaid services, which provide for the welfare of the people and promote the public health, have been recognized as "a primary function of government." *Bayne v. Secretary of State,* 283 Md. 560, 571, 392 A.2d 67 (1978). In our view the State is acting in its governmental capacity in providing Medicaid services. Accordingly, we hold that the doctrine of equitable estoppel does not apply in this case.

*Judgment affirmed.*
*Costs to be paid by the appellant.*