Dear Bruce A. Myers, CPA
You have requested our opinion whether State agencies may use a method known as "Construction manager at risk" ("CMR") to carry out a construction project. You describe the CMR method as commencing with a State agency's procurement of a construction manager by a competitive process. The construction manager is then responsible for working in conjunction with the architect on the design, providing a "guaranteed maximum price" for construction of the project — accepting the risk that the cost of the project may exceed that price — and procuring the actual construction of the project. You question whether the CMR method, which generally involves a competitive procurement process for the construction manager only at the initial phase, improperly avoids requirements of the State Procurement Law intended to foster competition.
In our opinion, State law does not prohibit the use of CMR as a project delivery method, provided (a) the construction manager is selected by one of the means authorized by the Procurement Law, such as competitive sealed bidding or competitive sealed proposals, or by the approved policies and procedures of agencies not subject to the Procurement Law, and (b) the agency complies with any applicable regulations and directives of the Board of Public Works. The merits of CMR with respect to a particular construction project will depend on how well the procurement is structured to provide the winning construction manager with incentives to limit the cost of the project while delivering it in a timely manner. The General Assembly has delegated to the Board of Public Works the authority to set policy under the Procurement Law. It is the role of the Board to decide whether the use of CMR as a project delivery method in a particular case is structured to be advantageous to the State and in accordance with the general purposes of the Procurement Law. The Board may wish to consider adopting regulations or policies to guide agencies in structuring CMR contracts to meet these goals.
 I Background
A. Project Delivery Method v. Source Selection Method
It is important to distinguish between a project delivery method and a source selection method, although there is inevitably some overlap in the two concepts. "Project delivery" denotes the method by which the design, construction, finance, risk management, and other elements of a construction project are combined to carry out the project. 1 Bruner O'Connor, Construction Law § 2:10 (May 2006). "Source selection" denotes the method by which the entities or contractors that carry out the various stages or aspects of the project are selected. The project delivery method may affect how and w hen contractors are selected for different aspects of the project; hence, the two concepts are not entirely distinct. A statute prescribing specific methods of source selection for public contracts might preclude certain project delivery methods. Id.
B. Construction Manager at Risk
"Construction manager at risk" ("CMR") is a project delivery method that is used by private and public entities to carry out construction projects. CMR may be contrasted with a traditional delivery method often referred to as "design-bid-build."[1] In the design-bid-build method, the owner engages an architectural and engineering firm to prepare a design of the facility, including construction drawings, specifications, and contract packages. The completed design package is let out for bid to interested general contractors, with selection typically based on price — i.e., the lowest bidder typically wins the contract. Each contractor bases its price on contracts it has negotiated with specialty subcontractors. See 1 Bruner O'Connor, Construction Law § 2:11 (May 2006). The general contractor, who had no role during the design phase, is responsible for constructing the facility in accordance with the design. Once the design phase ends and construction begins, the design firm's role is usually limited to responding to design questions on behalf of the owner.
The perceived advantages of design-bid-build are that the design is completed before construction phase is priced, and that the construction phase can thus be bid simply on the basis of the lowest price.Id. This method is also identified with certain disadvantages: because the contractor does not participate in the design phase, the project loses the benefit of the contractor's perspective on materials, construction feasibility, and control of project costs (potentially resulting in change orders that may add to the price); the process can be slow and cumbersome; the competitive bidding process for the construction phase may encourage bidding to minimum specifications.Id.
In the CMR method, a construction manager acts as both project coordinator during the design phase and also as general contractor, with the same risk in the latter capacity as a general contractor. See, e.g.,Modern Real Estate Transactions: An Overview of Architect andConstruction Contracts, ALI-ABA Continuing Legal Education (2006), SM 002 ALI-ABA 663. Construction may begin before the design phase is completed.
The owner of the project engages the construction manager during the design phase of the project. The construction manager is often chosen, at least in part, on the basis of qualifications as opposed to price alone, and acts as a member of a collaborative design team, providing pre-construction services such as schedule, budget, and construction reviews. The construction manager may assist the owner of the project in determining whether the design can be built within the owner's budget; if not, the direction of the design work can be changed.
At some point during the process, the construction manager and owner negotiate a guaranteed maximum price (GMP) for both the construction management services and the construction itself based on a partially completed design and the construction manager's estimate of the cost of the remaining design and construction items. 2 Bruner O'Connor, Construction Law § 6:59 (May 2006). The owner may also require the construction manager to post a bond for the GMP. See 63 Opinions of theAttorney General 549, 551 (1978). If permitted by the terms of the contract, the owner of the project may also seek competing proposals for a GMP at that point.
The construction manager typically acts as the general contractor during construction, assuming the risk of subcontracting the work and guaranteeing completion of the project at the fixed, negotiated GMP. 2 Bruner O'Connor, Construction Law § 6:59 (May 2006). The construction manager may bid and subcontract portions of the work at any time. In entering into the trade subcontracts, the construction manager assumes the risk that the total cost will exceed the GMP.[2] The construction manager is thus liable to the owner for the subcontractors' performance and to the subcontractors for payment. Id. A CMR contract may provide that, if the ultimate cost of the project is below the GMP, both the owner and the construction manager may share the benefit of those cost savings.
The perceived benefits of CMR are the ability to incorporate a contractor's perspective into planning and design decisions and to fast-track early construction components prior to full completion of design. "His expertise is thus used to avoid the dilemma common in government procurements: discovering after bids are received that the project design cannot be built within the project budget." Nash Love,Innovations in Federal Construction Contracting, 45 Geo. Wash. L.Rev. 309, 366-67 (1977). Moreover, as a prior opinion of this Office concerning a school construction project noted, the GMP clause "provides incentive to the construction manager to perform its mission so that the school board receives a completed school building at or below the guaranteed maximum price." 63 Opinions of the Attorney General 549, 555 (1978). A disadvantage of CMR is the adversarial relationship that may develop between the construction manager and the owner once construction begins and tensions arise over construction quality, the completeness of the design, and impacts to schedule and budget. See Construction Management Association of America, Choosing the Best Delivery Method forYour Project at 4 http://cmaanet.org/best_delivery_method.php. Also, a construction manager providing a GMP may have less incentive than a contractor participating in a competitive sealed bidding process to submit the lowest possible price. See 1 Bruner O'Connor, Construction Law § 2.13 (May 2006).[3]
C. CMR in Maryland
Since at least the late 1970s, some public entities in Maryland have used CMR, although most such instances have not involved contracts under the State Procurement Law. For example, CMR has apparently been used on occasion for local public school construction. In 63 Opinions of theAttorney General 549 (1978), Attorney General Burch concluded that a local school board could use a delivery method very similar to CMR, including a GMP provided by a construction manager backed with a performance bond, for a State-subsidized project without using competitive sealed bids for source selection, if the school board employed a competitive procedure to select the construction manager, did not permit the construction manager itself to bid on construction work, and obtained the approval of the Board of Public Works. See also
Annotated Code of Maryland, Education Article, § 4-126(b)(2) (authorizing the use of competitive negotiation for source selection in conjunction with CMR or other "alternative project delivery arrangements" for public school construction).[4]
We understand that the University System of Maryland, which is largely exempt from the State Procurement Law, see Annotated Code of Maryland, State Finance Procurement Article ("SFP"), § 11-203(e), has used CMR in a majority of its capital construction projects for a number of years.[5] The University System typically begins the process by procuring a construction manager through competitive sealed proposals. In developing a request for proposals ("RFP") for a CMR award, the University System requires that the construction manager provide various services during the design phase of the project (including constructibility reviews and cost estimating), insists on close oversight of subcontracts entered into by the construction manager,[6] requires submission of the GMP after its approval of the trade contractors,[7] and includes provisions that the University System and construction manager share any cost savings at the end of the project under a specified formula. The construction manager is to rework the project design or rebid the trade contracts if the GMP exceeds the budget for construction.[8] If the University System, or the Board of Public Works, rejects the GMP, the contract with the construction manager terminates. See, e.g., Construction Management Services At Risk, Fine and Performing Arts Center, Bowie State University, RFP No. 82410-B at p. V-9, 12-13. During construction, the construction manager acts essentially as a general contractor while continuing to assist and advise the University and its architect on continuing design issues. Id. at p. V-14.
Finally, the law governing the State capital program recognizes that "alternative construction methods" — a concept that encompasses CMR — may be used to carry out capital projects. SFP § 3-602(g).[9] The statute provides:
 Total project funding may utilize alternative construction methods, such as:
 (1) design/build which involves a single solicitation to design and build the facility;
 (2) "fast track" in which design and construction are implemented concurrently.
Although CMR does not always involve concurrent design and construction work, it could be considered a form of "fast track" that involves overlap of the design and construction phases of a project.[10]
In any event, an agency subject to the Procurement Law may only use a "fast track" method consistently with that law.
 II Analysis
You have asked whether the State Procurement Law precludes the use of CMR for State construction contracts.
A. State Procurement Law
The State Procurement Law, which occupies Division II of the State Finance Procurement Article,[11] seeks to employ broad-based competition and fair and equitable procedures to maximize the purchasing power of the State and to ensure the integrity of the procurement process. SFP § 11-201. Subject to certain exceptions, the Procurement Law governs the procurement of construction and construction services by State agencies. See SFP §§ 11-101(m), (n), 11-203, 11-204(a).
Within the parameters of the statute, the Board of Public Works has general authority over State procurement, including the authority to establish policy, adopt regulations, and create procedures.[12] SFP § 12-101(b)(2). The Procurement Law "looks . . . for the [B]oard to set basic procurement policy subject to the statute . . . ." Alan M. Wilner, The Maryland Board of Public Works: A History (1984) at p. 117; see also ARA Health Services, Inc. v. Dep't of PublicSafety and Correctional Serv., 344 Md. 85, 93, 685 A.2d 435 (1996). The Board has adopted comprehensive regulations, as well as policies, addressing most aspects of State procurement. See COMAR Title 21;see also www.bpw.state.md.us/bpw_ad.asp (Board of Public Works procurement advisories).
B. Application of State Procurement Law to CMR Source Selection
As you noted, the Procurement Law does not mention CMR.[13] However, the statute generally does not address project delivery methods. Rather, it authorizes a number of methods of source selection, with preference given to competitive methods.[14] Except for architectural and engineering services and information technology contracts, all procurement is to be by competitive sealed bids, unless one of the following methods is specifically authorized: competitive sealed proposals, noncompetitive negotiation, sole source procurement, emergency or expedited procurement, small procurement, an intergovernmental cooperative purchasing agreement, or auction bids. SFP § 13-102(a); see also COMAR 21.05.01.01 (same). The law also describes circumstances in which the alternative methods of source selection may be employed. For example, competitive sealed proposals may be used in a number of circumstances, including circumstances where the head of the unit determines that there is a need to use that method and the use of competitive sealed bidding "is not practicable or not advantageous to the State." SFP § 13-104(a)(3).
As noted in Part I of this opinion, contracts that involve CMR are typically procured by means of a competitive process, such as competitive sealed proposals, that may take into account bidder qualifications. Competitive sealed proposals are specifically authorized under the State Procurement Law when the procurement officer, with the unit head's approval, determines that the use of competitive sealed bidding is not practicable or advantageous. SFP §§ 13-102(a)(1),13-104(a). It is our understanding that the competitive sealed proposal method is usually used for a CMR contract.
Cost and Price Principles
The Procurement Law directs the Board of Public Works to adopt regulations on price and cost principles for State procurements that can be used as guidelines for negotiations on estimated costs, fixed prices, and contract modifications. SFP § 13-213. Such regulations are found at COMAR 21.06.03, 21.06.04, and 21.09.01. CMR can be utilized consistently with those regulations. For example, a pertinent regulation lists particular contract types, or pricing methods, in the following order of preference: fixed-price, fixed-price incentive, cost plus incentive fee, and cost-plus fixed fee or cost-reimbursement. COMAR 21.06.03.01B. Similarly, while the Procurement Law permits a unit, subject to an exception,[15] to enter into a pricing method "that will promote the best interests of the State," the statute directs the unit "[i]f practicable . . . [to] give preference to a fixed-price form of procurement contract." SFP § 13-214(a)(2). CMR is an example of a fixed-price contract.
Contract Modification Procedures
A CMR contract necessarily involves a substantial modification of the cost of the contract when the GMP is set. Under the State Procurement Law, a contractor must certify cost and price information when a contract modification will exceed $100,000. See SFP § 13-220; COM A R21.06.04.01. A contract modification is also subject to certification by the fiscal authority that the increase in cost will not exceed budgeted funds. See COMAR 21.03.03.01, 21.07.02.02. In addition, unless an agency has been delegated contracting authority by the Board of Public Works, the agency must obtain Board approval prior to agreeing to a modification of procurement contract. See C O M AR 21 .02 .01; ARAHealth Services, Inc., 344 Md. 85, 93-94, 685 A.2d 435 (1996). Assuming that an agency complies with these procedures and obtains the necessary certifications and approvals, a CMR contract could be implemented under these procedures.
The regulations on cost and price principles can be used in establishing the GMP for purposes of the modification procedures. Basing the GMP on prices obtained from competitively bidding the trade subcontracts (as is typically the case with State CMR contracts) can ensure that the CMR contract is consistent with SFP § 13-220 and COMAR21.06.04.01, and provide a basis for the Board to determine that the GMP is reasonable. The costs principles in COMAR 21.09.01.05 also provide guidance to an agency in negotiating a CMR contract's general conditions cost and management fee, typically the smallest components of the GM P, and the only components that would not be the subject of some form of competitive pricing.
Procurement Preferences
Title 14 of the State Procurement Law establishes various preferences in State procurement, including programs related to blind and disadvantaged individuals, small businesses, and minority business enterprises (MBEs). Nothing in a CMR contract would appear to inhibit an agency from complying with its obligations under these provisions of the Procurement Law.[16]
Thus, while the Procurement Law does not expressly mention CMR, neither does it prohibit the use of CMR, and it appears that CMR contracts as they are typically structured can comply with the applicable regulations under the Procurement Law.
C. Compliance with Board Policies Addressing CMR Contracts
Even if a competitive source selection method is used to choose a construction manager for a CMR contract and the contract modification procedures are followed, the use of this project delivery method may be at odds with basic principles animating the Procurement Law. For example, the GMP generally will represent most of the cost of the contract and is not itself a subject of competitive bidding. In such circumstances, the State Procurement Law contemplates that the Board of Public Works will provide direction to State agencies under its delegated authority to adopt regulations and policies governing State procurement and to approve State contracts.
The Board has already adopted certain practices in connection with awards of contracts that involve use of CMR by agencies that are not subject to the Procurement Law. In practice, the Board has required that an agency obtain its approval twice in connection with a procurement that utilizes CMR. First, when an agency that contemplates using CMR awards a pre-construction services contract to a construction manager, that contract is to be presented to the Board for its approval. Second, when the agency later seeks to modify the contract to add the GMP, including the trade contracts and the construction services fee, the agency returns to the Board again for approval of that modification.
The Board has recently included more detailed guidelines on the use of CMR and other methods in its regulations that govern local public school construction supported by State funds. See COMAR 23.03.04.06. Those regulations condition the receipt of State funds on the use of certain approved methods of source selection to choose the construction manager, including competitive bidding, quality-based selection, competitive negotiation, and other methods. COMAR 23.03.04.06D(4). In addition, before it negotiates a GMP with a construction manager who has provided pre-GMP services, the local education agency must allow for the submission of competing proposals after giving public notice. COMAR23.03.04.06B(2)(b).
In an analogous context, the Board of Public Works has developed a written policy requiring an agency wishing to use a method other than competitive sealed bidding for new construction or renovation to explain to the Board prior to the solicitation why the other method was chosen and the expected benefits of the other method. See Board of Public Works, Secretary's Agenda, Item 30 (Policies and Procedures Manual) (September 4, 1991); see also Board Procurement Advisory 1999-1 (two-stage process for the design-build delivery method), available at www.bpw.state.md.us. The Board requires that an agency follow the same procedure "whenever a design/build or variant of that method is proposed for a construction project and is to be used in lieu of the traditional A/E contract." Id.
Finally, as noted above, agencies that currently use CMR with Board approval have typically required that trade contracts be competitively bid by the construction manager with agency oversight.[17] (Such oversight is generally lacking in the standard competitively bid contract, where the State has no participation in or control of the general contractor's procurement and contracting with subcontractors). Thus, whether the benefits of competition can be retained in a delivery method that allows for the construction manager to provide useful input to better estimate or reduce costs during the design phase will depend on the procedures used in formulating this type of contract.[18]
D. Summary
The State Procurement Law primarily focuses on source selection and does not directly address project delivery methods such as CMR. Because only the selection of the construction manager, which represents a fraction of total project costs, is done by a competitive procurement by the agency, there is a possibility that the CMR method could be misused to avoid competition or that an absence of competition when the GMP is set could prove detrimental to the State.[19] The Board may wish to adopt regulations or policies — e.g., competitive bidding and agency oversight of the subcontracting process, agreement on a GMP, two-stage review by the Board — to ensure that the use of CMR is consistent with the statute's goals of fostering competition and providing increased economy in the procurement system.
 III Conclusion
For the reasons stated above, State law does not prohibit the use of CMR as a project delivery method, as long as (a) the construction manager is selected by one of the source selection methods authorized by the Procurement Law, such as competitive sealed bidding or competitive sealed proposals, or by the approved policies and procedures of agencies not subject to the Procurement Law, and (b) the agency complies with any applicable regulations and directives of the Board of Public Works. The merits of CMR with respect to a particular construction project will depend on how well the procurement is structured to provide the winning construction manager with incentives to limit the cost of the project while delivering it in a timely manner. The General Assembly has delegated to the Board of Public Works the authority to set policy under the Procurement Law. It is the role of the Board to decide whether the use of CMR as a project delivery method in a particular case is structured to be advantageous to the State and to satisfy the goals of the Procurement Law. The Board may wish to consider adopting regulations or policies to guide agencies in structuring CMR contracts to meet these goals.
 Douglas F. Gansler Attorney General
 Mark J. Davis Assistant Attorney General
 Robert N. McDonald Chief Counsel Opinions and Advice*
* Assistant Attorney General Dana A. Reed contributed significantly to the preparation of this opinion.
[1] For purposes of this opinion, we need not survey other delivery methods such as multiple-prime contracting, design-build, and agency management services. See, e.g., Modern Real Estate Transactions: AnOverview of Architect and Construction Contracts, ALI-ABA Continuing Legal Education (2006), SM 002 ALI-ABA 663.
[2] As explained in footnote 6 below, a typical practice of agencies using CMR in Maryland is to require the construction manager to competitively bid the trade contracts before the GMP is negotiated.
[3] We express no view on the relative merits of CMR as compared with any other project delivery method. As we explain below, the determination of its merits for a particular type of procurement is the responsibility of the Board of Public Works.
[4] This statute was enacted in 2004. Chapters 306, 307, Laws of Maryland 2004. Pursuant to that law, the Board of Public Works has recently adopted regulations that govern the State's Public School Construction Program and that deal with methods of both source selection (COMAR 23.03.03) and project delivery (COMAR 23.03.04). See 34:10 Md. Reg. 891 (May 11, 2007), adopting regulations as proposed in 34:4 Md. Reg. 410 (February 16, 2007).
[5] Although the University System is largely exempt, it is to comply with written policies and procedures that are subject to review and approval by the Board of Public Works. SFP §§ 11-203(e)(3). The USM Board of Regents Policy (VIII-10.30 "Policy concerning Capital Improvement Projects") states that, for projects exceeding $10 million in construction costs, "[t]he Board prefers that a construction manager be utilized (via contract) to administer these projects."
[6] For example, the University System requires the construction manager to submit to the university a description of its bidding procedures and the bidding documents it will provide to subcontractors. The construction manager must issue the same solicitation package to all trade contractors competing for award and the university to all meetings between the construction manager and prospective trade contractors. The University System reserves the right to reject any trade contractor recommended by the construction manager. See, e.g., Construction Management Services At Risk, Fine and Performing Arts Center, Bowie State University, RFP No. 82410-B.
[7] The GMP is to separately identify its component cost items, including direct construction costs (trade contracts), alternates, allowances, general conditions, construction manager contingency, and construction manager construction services fee. Construction Management Services At Risk, Fine and Performing Arts Center, Bowie State University, RFP No. 82410-B at p. V-7.
[8] The construction manager develops a budget independent of the design team and updates it at each of the three design submission stages. See Construction Management Services At Risk, Fine and Performing Arts Center, Bowie State University, RFP No. 82410-B at p. V-4. If the budget exceeds the original estimate, the construction manager and design team work together to reconcile the disparity and, as necessary, to redesign the facility. Id. at p. V-4, 5. The construction manager submits the GMP after approval of the final construction documents. Id. at V-7.
[9] The statute exempts any capital project funded by the Transportation Trust Fund from various "submissions and approvals" required by the statute, but not from the authorization to use alternative construction methods. SFP § 3-602(i).
[10] This statute was enacted in 1988 as a result of a recommendation of the Legislature's Special Joint Committee on the State's Capital Program, which studied ways to streamline the capital budgeting process. The Department of State Planning ("DSP"), which had worked with the committee to develop its recommendations, explained that these procedures would "reduce the time necessary to complete a project by abandoning the sequential process of program-design-construction-equipment" — i.e., the traditional design-bid-build project delivery method. Testimony of DSP in Support of Senate Bill 154 (April 4, 1988). Acting on this recommendation, the General Assembly passed Senate Bill 154, which included the authorization for alternative construction methods in SFP § 5-309(g), and which was later recodified as SFP § 3-602(g). See Chapter 753, Laws of Maryland 1988; Chapter 540, Laws of Maryland 1989.
[11] Division II consists of Titles 11 through 19 of the State Finance Procurement Article.
[12] The Board does not review capital expenditures by the Department of Transportation or the Maryland Transportation Authority for State roads, bridges or highways. SFP §§ 12-101(a), 12-202. In practice, neither agency uses CMR for these projects.
[13] Some states have specifically authorized the use of CMR by statute. See, e.g., Ariz. Rev. Stat. § 34-101(4) (defining "construction-manager-at-risk"); Ariz. Rev. Stat. § 34-602; 5 Me. Rev. Stat. Ann. § 1743; Mass. Gen. Laws Ann. 149(A), § 2; N.C. Gen. Stat. Ann. § 143-128.1; S.D. Con. Laws § 5-18-47; Vernon's Tex. Stat. Codes Ann., Government Code, § 2166.2532.
Other states make use of CMR even in the absence of specific statutory authorization. See Illinois Office of Auditor General, State'sConstruction Contracting Methods (2002) at p. 44. (reporting that Florida relied on CMR for approximately 80% of its construction projects, although there was no specific statutory authorization for that method of project delivery). In states without a statute specifically authorizing CMR, Attorneys General have reached varying conclusions about the use of CMR by state agencies, although those conclusions may depend on whether a competitive process would be used to select the construction manager. Compare Miss. A.G. Opinion No. 2006-00165, 2006 WL 1966819 (May 19, 2006) (state agency may not use CMR if construction manager is not selected on the basis of competitive bidding) with S.C. A.G. Opinion, 2004 WL 2247471 (October 1, 2004) (CMR not prohibited despite absence of explicit statutory authorization; opinion describes competitive negotiation process for selection of construction manager).
[14] Since its inception, the Procurement Law has focused on source selection to ensure fair competition and the other goals encompassed by that law. See Chapter 775, Laws of Maryland 1980 at p. 2666.
[15] Cost-plus-a-percentage-of-cost contracts are prohibited. SFP § 13-214(b); COMAR 21.06.03.01A.
[16] For example, we understand that the University System uses the applicable MBE goals to its CMR contracts.
[17] Typically, the trade contracts will be between the trade contractors and the construction manager, not the agency. If the agency were a party to those contracts, they would be subject to the solicitation requirements of the State Procurement Law.
[18] The General Assembly recently amended the Public Ethics Law to achieve a similar result by expanding the use of the design-build delivery method. See Chapter 84, Laws of Maryland 2004. That law amended State Government Article § 15-508 to permit engineering firms to participate in the preliminary engineering phase of design-build projects without, in most cases, being disqualified from participating in the construction contract for the project.
The 2004 legislation was apparently needed because some design-build contracts involve separate design and construction contracts and the engineering firm's participation in the design of the specifications for the construction contract could disqualify it under the Public Ethics Law from later participation in the construction contract. CMR, on the other hand, typically requires only a single contract for design and construction. See,e.g., Choosing the Best Delivery Method for YourProject at 4-8; Modern Real Estate Transactions: An Overview ofArchitect and Construction Contracts, ALI-ABA Continuing Legal Education (2006), SM 002 ALI-ABA 663.
[19] The Legislative Auditor recently criticized, on policy grounds, the Maryland Stadium Authority's use of CMR for a particular procurement. See Office of Legislative Audits, Audit Report — Maryland Stadium Authority (February 2007) at pp. 9-11. *Page 80