*State of Maryland, Comptroller of Maryland v. Badlia Brothers, LLC d/b/a Southwest Check Cashing*, No. 23, September Term, 2024.


**SOVEREIGN IMMUNITY – STATE GOVERNMENT § 12-201(a) – WRITTEN CONTRACT – FORMAL CONTRACT**

The State has inherent sovereign immunity and thus cannot be sued absent its consent. Section 12-201(a) of the State Government Article forbids the State from raising a sovereign immunity defense in a "contract action" that is "based on a written contract" executed by a State official acting with proper authority. That includes a formal contract, which is a type of written contract that is made through the observance of certain prescribed formalities.

**FORMAL CONTRACT – NEGOTIABLE INSTRUMENTS – CHECKS – HOLDER IN DUE COURSE**

A negotiable instrument is a type of formal contract that is: "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it: (1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder; (2) Is payable on demand or at a definite time;" and (3) With certain exceptions not relevant here, does not contain other undertakings or instructions. Md. Code Ann., Com. Law § 3-104(a) (2013 Repl.). A check is a form of negotiable instrument and thus a contract for purposes of the waiver of sovereign immunity in State Government § 12-201(a). Accordingly, the State has waived sovereign immunity for the claims of a holder in due course seeking payment on a check issued by the State.

Circuit Court for Baltimore City
Case No. 24-C-24-000440
Argued: December 10, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 23

September Term, 2024

_____

STATE OF MARYLAND, COMPTROLLER
OF MARYLAND

v.

BADLIA BROTHERS, LLC D/B/A
SOUTHWEST CHECK CASHING

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Fader, C.J.
Watts, J., dissents.

_____

Filed: March 28, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The question before us is whether the State has waived sovereign immunity as to the claims of a holder of State-issued checks who paid money for the checks in good faith—a "holder in due course"—seeking payment on those checks. The answer turns on whether a check is a contract for purposes of the State's waiver of sovereign immunity in § 12-201(a) of the State Government Article (2021 Repl.). We hold that it is. Accordingly, the State has waived sovereign immunity.

The State of Maryland possesses an inherent sovereign immunity: there can be no "suits against the State or its entities absent its consent." *Magnetti v. Univ. of Maryland*, 402 Md. 548, 557 (2007). The State has provided such consent in a variety of circumstances. As relevant here, § 12-201(a) of the State Government Article forbids the State from raising a sovereign immunity defense in a "contract action" that is "based on a written contract" executed by a State official acting with proper authority.

The State (the petitioner) and Badlia Brothers, LLC ("Badlia") (the respondent) dispute whether a State-issued check is a contract that can be enforced by a holder in due course. The State accepts that checks it issues are contracts between the State and the original payees. But the State asserts that any effort to enforce checks by subsequent holders are not contract actions as to which the State has waived sovereign immunity. Badlia responds that checks are contracts, that they do not lose that status when the person seeking to enforce them is not the original payee, and that actions to enforce them are contract actions. We agree with Badlia.

Checks are a species of negotiable instruments, meaning that, subject to certain well-established requirements, they are freely transferable by those holding them and

payable on demand when presented to the issuer. Checks, like other negotiable instruments, have long been considered contracts, both at common law and as codified in the Maryland Uniform Commercial Code ("MUCC") and its predecessor, the Negotiable Instruments Act. Even though negotiable instruments have different requirements and features than traditional bilateral contracts, that does not make them any less contracts. We therefore decline the State's invitation to read the term "contract" in State Government § 12-201(a) to exclude checks. Accordingly, we will affirm the decision of the Circuit Court for Baltimore City.

## BACKGROUND

The facts are not disputed. Badlia is a business that cashes checks. At issue are 15 checks Badlia cashed that were issued by the State of Maryland—some by the Maryland Department of Labor and others by the Comptroller of Maryland—but that the State had already paid before Badlia presented them for payment to the State's bank.[1] In some cases, the original payees had deposited checks using a mobile app—a process that produced "substitute checks"—and also either fraudulently or negligently presented the same checks to Badlia.[2] In other cases, the original payees reported checks lost or stolen, causing the

---

[1] The parties state that 16 checks were originally at issue. However, only 15 checks are contained in the record and referenced in the affidavits submitted in the District Court of Maryland. In any event, by the time of the District Court's judgment, only 10 of the checks, written for a total of $17,198.00, remained at issue.

[2] The United States Congress anticipated this problem concerning the use of mobile deposit "substitute checks" when it passed the Check Clearing for the 21st Century Act ("Check 21 Act"), 12 U.S.C. §§ 5001 – 5018. Under the Check 21 Act, a "substitute check" is a reproduction of a check that contains an image of both sides of the check, contains additional specified information, physically conforms to industry standards, and is

2

State to issue stop payment orders on the original checks and then issue and pay replacement checks. The individuals then cashed the supposedly lost checks with Badlia. In all 15 cases, Badlia accepted the checks with no knowledge that the State had already made payment and then presented them for payment. The State refused to honor the checks.

Badlia filed complaints against the State in the District Court of Maryland sitting in Baltimore City, claiming the right to enforce the checks as a holder in due course. The court consolidated the cases, ruled that the State enjoyed qualified immunity, and dismissed the cases. The Circuit Court for Baltimore City reversed. The court held that a check is a contract, and thus, the State had waived sovereign immunity. On remand, the District Court found that Badlia was a holder in due course entitled to enforce the checks. The circuit court affirmed, and the State petitioned for certiorari, which we granted. *State v. Badlia Brothers, LLC*, 488 Md. 387 (2024).

---

"suitable for automated processing in the same manner as the original check." *Id.* § 5002(16). Such a substitute check may be produced from an "electronic image of the original check." *Id.* § 5002(18). A substitute check is "the legal equivalent of the original check for all purposes" if it is accurate and bears a legend identifying it as a copy. *Id.* § 5003(b). As discussed below in Section V, a bank that transfers, presents, or returns a substitute check for consideration makes certain warranties, including that "no depositary bank, drawee, drawer, or endorser will receive presentment or return of the substitute check" such that they will be asked to make payment on a check they have already paid. *Id.* § 5004. The law further establishes a remedy for, among others, the drawer of the original check to recover for a breach of that warranty. *Id.* § 5005 (establishing an indemnity for a bank that creates or first transfers a substitute check); *id.* § 5009(a) (establishing the measure of damages for breach of warranty).

## DISCUSSION

This case lies at the intersection of sovereign immunity and contract law regarding negotiable instruments. A check, a type of negotiable instrument, was a formal written contract at common law and remains so as codified in statute. As with other negotiable instruments, when a holder transfers a check for value to another, who receives it in good faith without notice of defects or defenses, the transferee becomes a holder in due course entitled to enforce the check. *See* Md. Code Ann., Com. Law §§ 3-203, 3-302 (2013 Repl.). The action of a holder in due course to enforce payment of a check is thus a contract action for which the State has waived sovereign immunity under § 12-201(a) of the State Government Article.

## I.  STANDARD OF REVIEW

Whether the State waived its sovereign immunity for holder in due course actions is a legal question, which we review without deference. *See Gables Constr., Inc. v. Red Coats, Inc.*, 468 Md. 632, 645 (2020).

## II.  PRINCIPLES OF INTERPRETATION

This case requires us to interpret State Government § 12-201(a). The goal of statutory construction is to carry out the intent of the Legislature. *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024). We begin with the text of the statute and the context of the scheme in which the text resides. *Id.* We avoid adding or subtracting language and forced or subtle interpretations that may change the meaning of the provision. *Id.* If words are undefined, we often look to dictionaries as a starting point to assess the ordinary and popular meaning of a word. *Id.* If the text is ambiguous—or if we seek to confirm or check

4

our plain language interpretation—we look to other indicia of legislative intent, including legislative history. *Id.* at 645; *see also Elsberry v. Stanley Martin Cos.*, 482 Md. 159, 190 (2022). Text is ambiguous if "the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme[.]" *See Bennett v. Harford County*, 485 Md. 461, 485-86 (2023) (quoting *Wheeling v. Selene Fin. LP*, 473 Md. 356, 377 (2021)).

We operate under the rebuttable presumption that the General Assembly was aware of both the common law and case law of this Court when it passed the waiver of sovereign immunity now codified in § 12-201(a). *See Consol. Constr. Servs., Inc. v. Simpson*, 372 Md. 434, 461 (2002). As the predecessor to § 12-201(a) was enacted in 1976, we will examine whether checks were considered contracts at that time. The answer then, as now, is that they were.

### III. SOVEREIGN IMMUNITY AND CONTRACT CLAIMS

Sovereign immunity is a long-standing doctrine "[g]rounded in ancient common law[.]" *Condon v. State of Maryland-Univ. of Maryland*, 332 Md. 481, 492 (1993). The federal government, states, and tribes all possess some level of sovereign immunity, subject to waiver.[3] In Maryland, sovereign immunity "prohibits suits against the State or its

---

[3] *See, e.g.*, *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 49-50 (2024) (discussing federal sovereign immunity doctrine); U.S. Const. amend. XI; *Alden v. Maine*, 527 U.S. 706, 712-13 (1999) (discussing sovereign immunity as it pertains to states); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 387 (2023) (reviewing tribal sovereign immunity); *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014) (same).

entities absent its consent." *Magnetti*, 402 Md. at 557; *see also ARA Health Servs., Inc. v. Dep't of Pub. Safety & Corr. Servs.*, 344 Md. 85, 91-92 (1996). Sovereign immunity is an "absolute immunity," *State v. Rovin*, 472 Md. 317, 347 (2021), and one that may be waived only "directly or by necessary implication[,]" *Katz v. Washington Suburban Sanitary Comm'n*, 284 Md. 503, 507-08 (1979). Indeed, we consider sovereign immunity to be "one of the highest attributes of sovereignty[.]" *Id.* at 512 (quoting *Dunne v. State*, 162 Md. 274, 288-89 (1932)).

Sovereign immunity precludes the maintenance of any suit against the State or its entities absent a specific waiver by the General Assembly. *Magnetti*, 402 Md. at 557. In assessing whether sovereign immunity applies, the Court looks at: "(1) whether the entity asserting immunity qualifies for the protection; and, if so, (2) whether the legislature has waived immunity either directly or by necessary implication, in a manner that would render the defense of immunity unavailable." *Id.* (quoting *ARA Health Servs., Inc.*, 344 Md. at 92). Waivers of sovereign immunity are narrowly construed in favor of the State. *Brawner Builders, Inc. v. State Highway Admin.*, 476 Md. 15, 32 (2021).

Until 1976, the State maintained broad sovereign immunity for contract claims. *See Baltimore County v. RTKL Assocs. Inc.*, 380 Md. 670, 675-82 (2004) (discussing the legislative history behind the enactment of the predecessor to § 12-201(a) and related provisions). In 1968, the General Assembly passed a joint resolution expressing the view that "[t]he present judicial doctrine of sovereign immunity often operates capriciously and unjustly to preclude recovery on many meritorious claims against state and local governments[.]" *Id.* at 679 (alteration in original) (quoting 1968 Md. Laws, Joint

6

Resolution No. 49). In 1976, the General Assembly enacted Article 41, § 10(a), the original

predecessor to what is now § 12-201(a). 1976 Md. Laws, Ch. 450; *RTKL Assocs. Inc.*, 380

Md. at 675-76. In an introductory "whereas" clause, the General Assembly explained the

reason for its action: "[T]here exists a moral obligation on the part of any contracting party,

including the State or its political subdivisions, to fulfill the obligations of a contract[.]"

*RTKL Assocs. Inc.*, 380 Md. at 676 (quoting 1976 Md. Laws, Ch. 450).

Currently,[4] § 12-201(a) provides:

> Except as otherwise expressly provided by a law of the State, the State, its officers, and its units may not raise the defense of sovereign immunity in a contract action, in a court of the State, based on a written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee.

Here, the actions filed by Badlia were brought in a Maryland State court, the checks at

issue are in writing, and the State does not contest that the checks were issued by authorized

individuals acting within the scope of their authority. The only point of dispute concerning

---

[4] As originally enacted in Article 41, the waiver provided:

> Unless otherwise specifically provided by the Laws of Maryland, the State of Maryland, and every officer, department, agency, board, commission, or other unit of State government may not raise the defense of sovereign immunity in the courts of this State in an action in contract based upon a written contract executed on behalf of the State, or its department, agency, board, commission, or unit by an official or employee acting within the scope of his authority.

1976 Md. Laws, Ch. 450. In 1980, the waiver was moved without change to Article 21, § 7-101. 1980 Md. Laws, Ch. 775, § 8. In 1984, as part of the creation of the State Government Article through the code revision process, the waiver was recodified without substantive change as State Government § 12-202(a). *See* 1984 Md. Laws, Ch. 284, § 1. The provision was renumbered as § 12-201(a) in 1986. 1986 Md. Laws, Ch. 265, § 1.

the application of § 12-201(a) is therefore whether checks are contracts. To resolve that dispute, we turn first to some general background concerning negotiable instruments.

## IV. CHECKS AS NEGOTIABLE INSTRUMENTS— SOME GENERAL BACKGROUND

A negotiable instrument is "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it: (1) Is payable to bearer or to order[5] at the time it is issued or first comes into possession of a holder; (2) Is payable on demand or at a definite time;" and (3) With certain exceptions not relevant here, does not contain other undertakings or instructions. Com. Law § 3-104(a). A check, as relevant here, is a form of negotiable instrument that is a signed, written instruction to pay money that is "payable on demand and drawn on a bank." *Id.* § 3-104(f) (defining check, as relevant here, as "a draft . . . payable on demand and drawn on a bank"); *id.* § 3-104 cmt. 4 (stating that "[a] draft is an instrument that is an order"); *id.* § 3-103(a)(6) (defining "order" as "a written instruction to pay money signed by the person giving the instruction").

The law of negotiable instruments uses specific terms to describe the parties relevant to a particular instrument. With respect to checks, the "maker" of the check is the "person

---

[5] A negotiable instrument that is payable to bearer, or a bearer instrument, is payable to whomever physically possesses the instrument. *See Paper*, Black's Law Dictionary (12th ed. 2024); *see also* Com. Law § 3-109(a). A negotiable instrument that is "payable . . . to order," or an order instrument, is payable to an identified payee, who can then indorse the instrument to be payable to bearer or to another payee. *See Negotiable Instrument*, Black's Law Dictionary (12th ed. 2024); *see also* Com. Law § 3-109(b). The checks at issue here were all order instruments, made payable to the order of identified people, the payees.

8

undertaking to pay" and the "drawer" is the "person ordering payment." *Id.* § 3-103(a)(5), (3). A maker and a drawer, often the same person, can also be referred to as an "issuer." *Id.* § 3-105(c). The "drawee" is the bank that is "ordered . . . to make payment." *Id.* § 3-103(a)(2). With respect to the checks at issue here, the State acted as the maker, drawer, and issuer, ordering its bank (the drawee) to make payment from the State's funds on deposit with that bank. The payees to whom the checks were made payable were the original "holders" of those checks.

When the original holders transferred, or "negotiated,"[6] the checks to Badlia in exchange for cash, Badlia became a "holder in due course" of the checks. *See id.* § 3-302(a). A holder in due course is a holder of a negotiable instrument who took possession of it in exchange for value, in good faith, and without notice of any problems with the instrument or its enforceability.[7] *Id.* A holder in due course has the right to

---

[6] "Negotiation" is the transfer of possession of a negotiable instrument by anyone other than the issuer. Com. Law § 3-201(a). The recipient thereby becomes a holder, *id.*, and is entitled to enforce the instrument, *id.* § 3-301 (identifying "the holder of the instrument" as a person entitled to enforce it). The negotiation of a check made payable to an identified person requires both transfer of possession and the identified person's indorsement. *Id.* § 3-201(b).

[7] More precisely, subject to exceptions not relevant here:

"[H]older in due course" means the holder of an instrument if:

(1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) The holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered,

enforce the instrument free from most contract defenses, including those "that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract[.]" *Id.* § 3-305(a)(2), (b). Here, Badlia asserts that its status as a holder in due course means it is not subject to defenses the State would have had against the original holders, including that the State had already made payment on the checks.

Historians debate the exact origin of negotiable instruments, but the pedigree is ancient.[8] Bills of exchange, a species of negotiable instrument, "unquestionably" existed in the 14th century. Jenks, note 8, at 71. Although the term "holder in due course" did not originate in England until the 19th century, *see* Bills of Exchange Act, 1882, 45 & 46 Vict., ch. 61 § 29; M.B.W. Sinclair, *Codification of Negotiable Instruments Law: A Tale of Reiterated Anachronism*, 21 U. Tol. L. Rev. 625, 630 (1990), the concept of a subsequent, good faith holder enjoying particular rights—often applied using the term "bona fide purchaser"—well predates that, *see* Sinclair, above, at 630; *Peacock v. Rhodes*, 99 Eng. Rep. 402, 402-03 (K.B. 1781) (holding that as to a stolen and negotiated bill of exchange, an innocent indorsee shall recover against the drawer). The concept is that to facilitate use of negotiable instruments and the commercial benefits they provide, a holder in due course

---

> (v) without notice of any claim to the instrument described in § 3-306, and (vi) without notice that any party has a defense or claim in recoupment described in § 3-305(a).

*Id.* § 3-302(a).

[8] *See generally* John H. Munro, *The Medieval Origins of the Financial Revolution: Usury, Rentes, and Negotiability*, 25 Int'l Hist. Rev. 505 (2003); James Steven Rogers, *The Myth of Negotiability*, 31 B.C. L. Rev. 265, 270 n.6 (1990); Jacob J. Rabinowitz, *The Origin of the Negotiable Promissory Note*, 104 U. Pa. L. Rev. 927 (1956); Edward Jenks, *On the Early History of Negotiable Instruments*, 9 L.Q. Rev. 70 (1893).

may rely on the face of the instrument without being required to investigate the details of the original contract. *See Peacock*, 99 Eng. Rep. at 402 (reasoning that a lack of contract defenses for the indorsee "would stop the currency of bills of exchange, because it would render it necessary for every indorsee to insist upon proof of all the circumstances, and the manner in which the bill came to the indorser").

This principle of English common law took hold in the United States in both common law and statute.[9] The concept and purpose behind adoption of the holder in due course rule was summarized in the United States Supreme Court's 1857 opinion in

---

[9] *See, e.g.*, *Goodman v. Simonds*, 61 U.S. 343, 365 (1857) ("[T]hat a *bona fide* holder of a negotiable instrument for a valuable consideration, without notice of facts which impeach its validity between the antecedent parties, if he takes it under an endorsement made before the same becomes due, holds the title unaffected by these facts, and may recover thereon, although, as between the antecedent parties, the transaction may be without any legal validity."); *Cecil Bank v. Heald*, 25 Md. 562, 573 (1866) ("The general principle of commercial law, that a *bona fide* holder of a negotiable instrument for a valuable consideration, without notice, will be protected against the antecedent equities of the original parties, is fully sustained by numerous authorities[.]"); James Barr Ames, *Specialty Contracts and Equitable Defences*, 9 Harv. L. Rev. 49, 58 (1895) (citing numerous common law decisions to support the proposition that "duress by the payee upon the maker of a negotiable note will not affect the rights of a subsequent *bona fide* holder for value"); 2 Thomas H. Calvert, Daniel on Negotiable Instruments 928 (7th ed. 1933) (explaining that, under the Negotiable Instruments Act, a holder in due course is "one who takes the paper before its maturity free from defenses of which he had no notice"); *id.* (noting that, under common law, a payee may be a holder in due course and that a "number of defenses were denied to obligors on such instruments as against an innocent payee"); *cf.* Md. Const. Declaration of Rights Art. 5(a)(1) (providing that "Inhabitants of Maryland are entitled to the Common Law of England"); *Gladden v. State*, 273 Md. 383, 389 (1974) ("In 1776 the framers of the Constitution of Maryland adopted the common law [of England] as part of the law of this State."); *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 n.5 (2008) (Roberts, C.J., dissenting) ("Exceptions (some created by statute) to the general rule against assignments at law arose early in the common-law period, including exceptions for . . . negotiable instruments[.]"); 29 Richard A. Lord, Williston on Contracts § 74:2, at 224-26 (4th ed. 2003) (acknowledging that "from the early times" bills of exchange were an exception to various non-assignability rules).

*Goodman v. Simonds*, in which the Court characterized the principle as "so long and so well established, and so essential to the security of negotiable paper, that it was laid up among the fundamentals of the law, and required no authority or reasoning to be brought out in its support[.]" 61 U.S. 343, 365 (1857). The Court went on to explain:

> Such being the settled law in this court, it would seem to follow as a necessary consequence from the proposition as stated, that if a bill of exchange endorsed in blank, so as to be transferable by delivery, be misappropriated by one to whom it was intrusted, or even if it be lost or stolen, and afterwards negotiated to one having no knowledge of these facts, for a valuable consideration, and in the usual course of business, his title would be good, and that he would be entitled to recover the amount. The law was thus framed, and has been so administered, in order to encourage the free circulation of negotiable paper by giving confidence and security to those who receive it for value; and this principle is so comprehensive in respect to bills of exchange and promissory notes, which pass by delivery, that the title and possession are considered as one and inseparable[.]

*Id.*

Checks "bec[a]me common practice in England" in the 1830s. Fritz Redlich & Webster M. Christman, *Early American Checks and an Example of Their Use*, 41 Bus. Hist. Rev. 285, 285-86 (1967). Although they were apparently non-negotiable in England when they were first introduced,[10] American practice diverged. *See id.* at 290. Indeed, it is "likely that the American check was negotiable from its earliest history – regardless of

---

[10] Some scholars suggest that early English checks may have been viewed as short-term instruments meant to be cashed by recipients on the day of receipt, and so were not susceptible to negotiability for later presentment. Redlich & Christman, above, at 286, 290; *see also* Albert J. Rosenthal, *Negotiability—Who Needs It?*, 71 Colum. L. Rev. 375, 382 n.35 (1971) ("There is a division of opinion among historians as to whether the check was thought to be negotiable in England until the late 19th century, some authorities holding that the instrument was not regarded as intended for negotiation and that claims and defenses were therefore not cut off.").

its form [as a bearer or order instrument] – and was primarily a medium of domestic exchange." *Id.*

## V. CHECKS ARE, AND HAVE LONG BEEN REGARDED AS, CONTRACTS.

### A. *Checks Are Contracts Under Common Law.*

Negotiable instruments, including checks, have long been recognized as a type of contract, sometimes referred to as a formal contract, at common law. As explained in the Restatement, certain types of contracts, including negotiable instruments, "are subject in some respects to special rules that depend on their formal characteristics and differ from those governing contracts in general[.]" Restatement (Second) of Contracts § 6 (Am. L. Inst. 1981). In other words, formal contracts are "made through the observance of certain prescribed formalities," *Formal Contract*, Black's Law Dictionary (12th ed. 2024) (identifying "the negotiable instrument" as one type of formal contract), rather than through satisfying the standard elements of traditional bilateral contracts. Negotiable instruments are a recognized category of formal contracts. *See, e.g.*, Restatement of Contracts § 7 (Am. L. Inst. 1932) (identifying negotiable instruments as a category of "[f]ormal contracts"); 22 Richard A. Lord, Williston on Contracts § 60:1, at 493-94 (4th ed. 2003) ("[N]egotiable instruments . . . constitute formal contracts or sets of contracts.").

Another type of formal contract is a contract under seal, which the Appellate Court of Maryland discussed in *Venners v. Goldberg*, explaining that such a contract does not require consideration. 133 Md. App. 428, 435 (2000). The court explained: "At common law, a contract signed under seal was a formal obligation that became operative and enforceable upon delivery. (Hence the expression 'signed, sealed, and delivered.')

Consideration was not an essential element of such a contract, and the contract was valid notwithstanding the absence of consideration." *Id.* Similarly, checks and other negotiable instruments do not require consideration on the face of the contract to be valid and enforceable. The absence of that requirement does not make a contract under seal or a negotiable instrument any less of a contract.

The long-standing view that a check, as a negotiable instrument, is a contract has been recognized by numerous state courts for more than a century.[11] For example, in *½ Price Checks Cashed v. United Automobile Insurance Co.*, the Texas Supreme Court recognized that a check is a contract and that "in signing the check, the drawer contractually obligates itself to pay the amount of the instrument to the instrument's holder." 344 S.W.3d 378, 386 (Tex. 2011).

---

[11] *See, e.g.*, *Am. Emigrant Co. v. Clark*, 47 Iowa 671, 674 (1878) ("Regarding the check as a contract complete in itself, which, as all other commercial paper, it is, the correctness of this instruction cannot be doubted."); *Aurora Nat'l Bank v. Dils*, 48 N.E. 19, 21 (Ind. Ct. App. 1897) ("The indorsement of a check is a distinct contract."); *Byrd Printing Co. v. Whitaker Paper Co.*, 70 S.E. 798, 800 (Ga. 1911) ("A check is a contract[.]"); *Deal v. Atl. Coast Line R.R. Co.*, 144 So. 81, 82 (Ala. 1932) ("[A] check is a contract within itself[.]"); *Howard v. Zilch*, 190 N.E.2d 77, 79 (Mass. 1963) (explaining that a check is a written contract); *Diemar & Kirk Co. v. Smart Styles, Inc.*, 134 S.E.2d 134, 136-37 (N.C. 1964) ("A check is a contract within itself. By the act of drawing and delivering it to the payee, the drawer commits himself to pay the amount of the check in the event the drawee refuses payment upon presentment."); *Blair v. Davis*, 281 So. 2d 247, 249 (Fla. Dist. Ct. App. 1973) (noting that a check is written contract); *Rocky Mountain Claim Staking v. Frandsen*, 884 P.2d 1299, 1302 (Utah Ct. App. 1994) (stating that a check is a form of negotiable instrument which, in turn, is a contract); *Lehman Bros. Holdings, Inc. v. Kee*, 268 A.3d 178, 188 (Del. 2021) (approving of another court's historical analysis that designated negotiable instruments as "formal contracts").

## B. *Checks Are Contracts Under the MUCC.*

Maryland statutory law has similarly long recognized checks and other negotiable instruments as contracts. From 1898 to 1964, Maryland law on the subject was found in the Negotiable Instruments Act. *See* 1898 Md. Laws, Ch. 119 (codified at Art. 13, §§ 13 – 208); *Venners*, 133 Md. App. at 437-38. Under that Act, an instrument was negotiable if it was in writing and signed by the maker or drawer, contained an unconditional promise or order to pay a sum certain, was payable on demand or at a fixed or determinable future time, was payable to order or bearer, and, where applicable, identified the drawee with reasonable certainty. 1898 Md. Laws, Ch. 119 (codified at Art. 13, § 20). The Act addressed, among other subjects, the general form and interpretation of negotiable instruments, *id.* (codified at Art. 13, §§ 20-42); what would be deemed consideration for the issuance of a negotiable instrument, *id.* (codified at Art. 13, §§ 43 – 48); the indorsement and negotiation of a negotiable instrument, *id.* (codified at Art. 13, §§ 49 – 69); and the rights of a holder of a negotiable instrument, including a holder in due course, *id.* (codified at Art. 13, §§ 70 – 78). The Act identified checks as negotiable instruments: "A check is a bill of exchange drawn on a bank payable on demand. Except as herein otherwise provided, the provisions of this Act applicable to a bill of exchange payable on demand apply to a check." *Id.* (codified at Art. 13, § 204).

As at common law, negotiable instruments as regulated by the Negotiable Instruments Act were understood to be contracts and treated as such. Thus, in *John Hancock Mutual Life Insurance Co. v. Fidelity-Baltimore National Bank & Trust Co.*, in assessing a conflict of laws dispute related to a negotiable instrument, our predecessors

15

identified certain necessary factors to consider. 212 Md. 506, 511 (1957). One such factor was "[t]hat the law relating to what law governs contracts in general is applicable" to what law governs negotiable instruments, "so far as general principles are concerned[.]" *Id.* Also, "an ordinary negotiable instrument often includes many contracts, each several signature—as maker, drawer, acceptor, guarantor, surety or indorser—being a separate contract[.]" *Id.* Accordingly, "each separate contract [reflected in a negotiable instrument] may bring into question a different place and law[.]" *Id.* We proceeded to apply general contract principles to determine the law that would define whether the checks at issue gave rise to enforceable legal contractual obligations. *Id.* at 511-16.

Maryland adopted the MUCC in 1963,[12] and that Act became effective the following year. 1963 Md. Laws, Ch. 538. The MUCC, now codified in the first ten Titles of the Commercial Law Article, was enacted to "simplify, clarify, and modernize the law governing commercial transactions," permit the ongoing expansion of commercial practices, and "make uniform the law among the various jurisdictions." Com. Law § 1-103(b). However, as the drafters of the model UCC expressly recognized, that law "was drafted against the backdrop of existing bodies of law, including the common law and equity, and relies on those bodies of law to supplement it[s] provisions in many important ways." *Id.* § 1-103 cmt 2;[13] *see also Wolfe v. Univ. Nat'l Bank*, 270 Md. 70, 75

_____

[12] The MUCC is Maryland's adoption of the model Uniform Commercial Code ("UCC").

[13] The official comments to the MUCC, which are taken directly from official comments to the model UCC, are a "useful aid for determining the purpose of its

16

(1973) ("UCC § 1-103 operates as a general adoption of common law principles to commercial transactions, where the code provisions do not apply to replace them[.]" (citation and internal quotation marks omitted)).

Title 3 of the MUCC governs the use of negotiable instruments in Maryland. *See* Com. Law §§ 3-101 – 3-605. That Title adopts a uniform set of provisions defining and setting a framework for the creation, negotiation, use, and enforcement of negotiable instruments. *Id.* A check is expressly recognized as a type of negotiable instrument in Commercial Law § 3-104 (defining a negotiable instrument, one category of which is a "draft," and defining a check, as relevant here, as "a draft . . . payable on demand and drawn on a bank").

Notably for our purposes, when it was first enacted in 1963, and as it existed in 1976 (when the General Assembly enacted the first predecessor to State Government § 12-201(a)), the MUCC expressly referred to negotiable instruments as contracts. For example, § 3-413 of the MUCC, which described the obligations undertaken by the "maker or acceptor" and "drawer" of a negotiable instrument, was titled "Contract of maker, drawer and acceptor." Md. Code Ann., Art. 95B, § 3-413 (1964 Repl.); Md. Code Ann., Com. Law § 3-413 (1975 Repl.); *see also* Art. 95B, § 3-414 (1964); Com. Law § 3-414 (1975) (describing obligation of an indorser who does not specify otherwise to pay an instrument if it is dishonored by another, as well as order of liability of indorsers to each other; titled "Contract of indorser; order of liability"); Art. 95B, § 3-414 cmt. 1 (1964);

_____

provisions" and are persuasive but not binding. *Jefferson v. Jones*, 286 Md. 544, 548 (1979).

17

Com. Law § 3-414 cmt. 1 (1975) (stating that a disclaimer made with an indorsement "varies the written contract of indorsement"); Art. 95B, § 3-415 (1964); Com. Law § 3-415 (1975) (describing rights and obligations of an accommodation party who signs an instrument; titled "Contract of accommodation party"); *Green v. State*, 32 Md. App. 567, 573 (1976) (explaining that, in the context of commercial law, there are "separate and distinct contracts of a drawer and of an indorser, as set out in §§ 3-413 and 3-414 of" the predecessor to the Commercial Law Article).[14]

In sum, a check, like other negotiable instruments, is a formal contract created by the observance of formalities now set forth in § 3-302 of the Commercial Law Article. Under the current MUCC, as under the Negotiable Instruments Act and the common law, the maker of a negotiable instrument undertakes a contractual obligation to pay the

---

[14] Amendments passed in 1996 and made effective in 1997 adopted the revised Article 3 of the Uniform Commercial Code. *See* 1996 Md. Laws, Ch. 91, § 2. When making those amendments, the General Assembly did not include headings for the sections. *See id.* Publishers of the Maryland Code have inserted the headings used by the drafters of the model UCC, which use the word "Obligation," rather than "Contract," in reference to the undertakings of issuers, acceptors, drawers, and indorsers. *See* Com. Law §§ 3-412 – 3-415. There is no suggestion in the language of the UCC, MUCC, or in the official comments to the model UCC that the change was intended to alter the status of negotiable instruments as contracts. Indeed, the word "obligation" itself is contractual language. *See, e.g.*, *Patton v. Wells Fargo Fin. Maryland, Inc.*, 437 Md. 83, 109 (2014) ("Under Maryland law, the parties to a contract may voluntarily agree to define their contractual rights and obligations by reference to documents or rules external to the contract."); *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001) (stating that to prove a breach of contract, one must show that "the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation"); *Contract*, Black's Law Dictionary (12th ed. 2024) (defining "contract" as "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law"). And, in any event, that change post-dated the General Assembly's waiver of sovereign immunity for a contract action by more than two decades.

instrument. Com. Law § 3-103(a)(5) (defining "maker" as the person undertaking the obligation to pay); *id.* § 3-412 (explaining that the "issuer," a term that encompasses a "maker," is obligated to pay the instrument). That obligation is enforceable by a holder in due course, *id.* § 3-203(b), irrespective of certain defenses the issuer may have against enforcement by a prior holder, *id.* § 3-305(b). The codification of the formal requirements that must be met to create a negotiable instrument, along with the rights and obligations of the parties to a negotiable instrument (including a maker such as the State of Maryland and a holder in due course such as Badlia), have not altered the status of a check as a contract or the status of those rights and obligations as contractual.

The State disagrees. It concedes that a check is a contract between its maker and its original payee but argues that it is not a contract between its maker and a holder in due course. The State acknowledges that under the MUCC a holder in due course is entitled to enforce a check against the maker but contends that is a statutory right, not a contract right for which the State has waived sovereign immunity under State Government § 12-201(a). The foundation for the State's contention is its position that § 12-201(a) waives sovereign immunity only for contract actions based on traditional bilateral contracts. Because traditional bilateral contracts require privity, *see, e.g.*, *Lithko Contracting, LLC v. XL Ins. Am., Inc.*, 487 Md. 385, 404-05 (2024); *Morris v. Osmose Wood Preserving*, 340 Md. 519, 545 (1995); *State v. Consol. Gas, Elec. Light & Power Co.*, 146 Md. 390, 395 (1924), which is lacking between a maker and a holder in due course, the State argues that it has not waived sovereign immunity for claims of holders in due course. For several reasons, we disagree.

19

First, the State's concession that a check is a contract between the maker and original payee for purposes of § 12-201(a) is inconsistent with its position that § 12-201(a) applies only to traditional bilateral contracts. Although there may be privity between a maker and an original payee, checks generally lack an additional fundamental requirement of a traditional bilateral contract: consideration. *See Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 147 (2003) ("To be binding and enforceable, contracts ordinarily require consideration."). The State's concession that a check is a contract between its original parties may avoid the absurdity of the position that the State's checks are not enforceable against it even by the original payees, but that concession undercuts its broader defense that § 12-201(a) applies only to traditional bilateral contracts.

Second, the State's position that § 12-201(a) applies only to traditional bilateral contracts finds no support in the plain language or context of that provision, nor in case law or any other authority that has been cited to us. Section 12-201 applies to a "contract action" that is "based on a written contract." The term "contract" is not limited to a traditional bilateral contract. *See* Restatement (Second) of Contracts § 1 (Am. L. Inst. 1981) ("A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."). There is no restriction in the text of § 12-201(a) to particular types or categories of written contracts, nor is it our place to add the phrase "traditional bilateral" before "contract" to restrict its unambiguous scope. *See Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024). And nothing about the statutory scheme and context in which § 12-201(a) appears suggests a narrower scope.

20

None of the cases cited in the State's briefs support the proposition that § 12-201(a) applies only to traditional bilateral contracts. In *Stern v. Board of Regents*, 380 Md. 691, 722 (2004), and *ARA Health Services, Inc. v. Department of Public Safety & Correctional Services*, 344 Md. 85, 96 (1996), we held that sovereign immunity was not waived due to a failure to meet specific requirements of § 12-201(a). In *Stern*, the requirement was that the contract be signed, 380 Md. at 722; in *ARA Health Services*, the requirement was that the relevant official or employee be acting within the scope of their authority, 344 Md. at 96. And in *Lizzi v. Washington Metropolitan Area Transit Authority*, which did not relate to § 12-201(a) at all, the Appellate Court of Maryland concluded that a plaintiff's claim styled as a breach of contract claim did not qualify for a separate waiver of sovereign immunity "for [the agency's] contracts" because the claim was based on the Family and Medical Leave Act, not a contract. 156 Md. App. 1, 12-13 (2003), *aff'd on other grounds*, 384 Md. 199 (2004).[15]

---

[15] At oral argument, the State cited the Appellate Court's opinion in *Maryland Transportation Authority Police Lodge No. 34 of Fraternal Order of Police, Inc. v. Maryland Transportation Authority*, 195 Md. App. 124 (2010), *rev'd on other grounds*, 420 Md. 141 (2011). There, in rejecting a contention that the State could be liable for "a contract that arises through the vehicle of promissory estoppel," the Appellate Court stated that because waivers of sovereign immunity must be construed narrowly, it would "consider that [§ 12-201(a)] contemplates a traditional bilateral contract[.]" *Id.* at 220. The court did not explain that conclusion, nor was that conclusion necessary to the court's analysis, which held that the State could be liable based only on a written contract and not based on promissory estoppel. *Id.* at 219-20. In context, the court was distinguishing a written contract signed by a person acting with authority from something that was not a contract at all. The court was not distinguishing one type of written contract signed by a person acting with authority (a traditional bilateral contract) from another type of written contract signed by a person acting with authority (a negotiable instrument). In any event, for the reasons discussed, we disavow the dicta suggesting that § 12-201(a) is limited to traditional bilateral contracts.

Third, although it is unnecessary to consult legislative history given the unambiguous scope of § 12-201(a), that too runs contrary to the State's position. The purpose of § 12-201(a) was to codify the "moral obligation on the part of any contracting party, including the State or its political subdivisions, to fulfill the obligations of a contract[.]" *Baltimore County v. RTKL Assocs. Inc.*, 380 Md. 670, 676 (2004). As discussed above, the obligation undertaken by the maker of a check, under the common law and now the MUCC, includes the obligation to make payment when the check is presented not only by the original payee but by any subsequent holder. *See* Com. Law § 3-203(b) ("Transfer of an instrument . . . vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course[.]"). That transferability is fundamental to any negotiable instrument and is part of the value of the instrument itself. Were we to accept the State's position, all checks it issues would effectively cease to be negotiable instruments, as no subsequent holder could legally enforce them against their maker. Although the State in this case is seeking to avoid liability only for paying checks it has already paid to a different party, its argument is not limited to that circumstance and would logically extend to all holders of checks who are not the original payee.[16] In the future, such holders would lack any legal recourse against

---

[16] The burden of such a holding might fall especially heavily on those who lack access to traditional banks and so depend on the negotiability of checks to obtain value from them. A report by the Federal Deposit Insurance Corporation ("FDIC") found that 4.2% of American households and 3.4% of Maryland households had no bank account. *2023 FDIC National Survey of Unbanked and Underbanked Households*, Appendix 73, FDIC (last updated Nov. 14, 2024), https://www.fdic.gov/household-survey [https://perma.cc/9F7W-5XVJ]. In addition, 14.2% of American households were underbanked, which the FDIC says includes the usage of non-bank financial services like

22

the State and would be left to rely on the State's moral obligation to make payment. That is exactly what § 12-201(a) was enacted to avoid.

Fourth, in addition to failing at its premise that § 12-201(a) applies only to traditional bilateral contracts, the State's privity argument also fails in its application. As explained by the New York Court of Appeals in 1857, "the maker of a negotiable instrument is deemed in law to enter into a contract with every one to whom it is afterwards negotiated[.]" *Farmers & Mechs.' Bank v. Butchers & Drovers' Bank*, 16 N.Y. 125, 141 (1857). Thus, the court held, "where the instrument is made by an agent . . . privity of contract can be established between such agent and the subsequent holders[.]"[17] *Id.* In other words, at common law, privity was deemed to be established between a maker and

---

check cashing. *Id.* The survey also found that "[n]early one in four households without a high school diploma (23.1 percent) were underbanked, compared with one in ten households with a college degree (10.4 percent)." *Id.* at Executive Summary 15 [https://perma.cc/296D-MU25]. "More than one in five Black, Hispanic, American Indian or Alaska Native, and Native Hawaiian or Other Pacific Islander households were underbanked, compared with one in ten White households (10.1 percent)." *Id.*

[17] *See also, e.g.*, *Second Nat'l Bank of Toledo v. Walbridge*, 19 Ohio St. 419, 424 (1869) (writing favorably that other courts held that "a bill of lading is not negotiable like a bill of exchange, so as to enable the indorsee to maintain an action upon it in his own name; the effect of the indorsement being only to transfer the right of property in the goods, but not the contract itself" (citing *Thompson v. Dominy*, 14 Mees. & Welsb. 403, 153 E.R. 532 (1845))); *Cincinnati, N.O. & T.P. Ry. Co. v. Citizens' Nat'l Bank*, 47 N.E. 249, 254 (Ohio 1897) (finding that a bona fide purchaser of stock should be protected as the purchaser would for any other negotiable instrument, and that "[t]he cases and authorities certainly show that the claim of the company that there is no duty (for that is all that can be meant by the use of the term 'privity') resting upon it or its agents towards third persons to observe care in the issue and transfer of its certificates of stock, and that, as a consequence, it is not liable to them for negligence in such matters, is not well founded" (citing Cook, Stocks & S. § 416)); *Nat'l Bank of Webb City v. Newell-Morse Royalty Co.*, 259 Mo. 637, 701-02 (1914) (rejecting a company's claim that there is no liability because there is no privity between it and third persons who may deal in its stock).

23

subsequent holders based on the undertakings inherent in a negotiable instrument. In any event, whether privity is deemed to exist or whether it is simply not required for enforcement of a formal contract such as a negotiable instrument, holders in due course can enforce contract rights in a check against its maker. And such claims are contract claims for which the State has waived sovereign immunity.

The State raises two other arguments we find equally unpersuasive. First, the State argues that the checks it issues are not checks at all but are instead warrants. That is incorrect. Warrants are internal orders issued by the Comptroller that approve a request to spend part of an appropriation. Md. Code Ann., State Fin. & Proc. § 7-216 (2021 Repl.). Money can then be disbursed from the State Treasury "in accordance with a warrant." *Id.* § 7-226. A check is one way the State disburses money. *Id.* § 7-227 (identifying requirements for "[a] check that is drawn to disburse money from the State Treasury").

Finally, the State contends that it cannot be liable to pay the checks presented by Badlia based on the foundational principle underlying sovereign immunity that, where the General Assembly has expressly waived immunity, "an action for a money judgment may not be maintained unless funds [have] been appropriated for that purpose or the agency can provide funds by taxation." *Bd. of Trs. of Howard Cmty. Coll. v. John K. Ruff, Inc.*, 278 Md. 580, 590 (1976). The State argues that because the General Assembly allocated funds to pay checks only once, this "action for a money judgment may not be maintained." However, State Government § 12-203 provides that "to carry out this subtitle, the Governor shall include in the budget bill money that is adequate to satisfy a final judgment that, after the exhaustion of the rights of appeal, is rendered against the State or any of its officers or

24

units." The General Assembly has thus provided for the budget to include amounts necessary to satisfy final judgments entered in this case.

Moreover, at least with respect to substitute check errors, we observe that the Check 21 Act, 12 U.S.C. §§ 5001 – 5018, discussed above in note 2, provides a mechanism for the State to recover its overpayment from the bank or banks responsible for improperly processing the checks. The Check 21 Act provides that a bank that transfers, presents, or returns a substitute check and receives consideration "warrants, as a matter of law," that the substitute check meets all legal requirements under the Check 21 Act and that "no depository bank, drawee, drawer, or endorser will receive presentment or return of the substitute check . . . [or the] original check such that [they] will be asked to make a payment based on a check that the bank, drawee, drawer, or endorser has already paid." *Id.* § 5004. A bank that breaches that warranty is liable for damages up to the amount of the substitute check and interest and expenses related to the substitute check. *Id.* § 5009(a); *see also* 69 Fed. Reg. 62553 ("Under this chain of warranties and indemnities, losses generally will be borne under the Check 21 Act by the reconverting bank, although the Act contains comparative negligence provisions to protect the reconverting bank from losses attributable to another person's fault."). Here, although we understand the State's desire to avoid making payment on checks it has already paid, the Check 21 Act contemplates exactly that scenario and provides a remedy to make the State whole that is not available to a holder in due course.

**CONCLUSION**

State Government § 12-201(a) waives the State's sovereign immunity for contract claims based on authorized written contracts. A check executed by a State official or employee acting within the scope of their authority is such an authorized written contract. Unless stated otherwise or absent any applicable exception, an inherent term of a check is that it may be enforced by a holder in due course. Accordingly, the State has waived its sovereign immunity for claims by a holder in due course seeking payment on an authorized State-issued check.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

26

Circuit Court for Baltimore City
Case No. 24-C-24-000440

Argued: December 10, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 23

September Term, 2024

_____

STATE OF MARYLAND, COMPTROLLER
OF MARYLAND

v.

BADLIA BROTHERS, LLC D/B/A
SOUTHWEST CHECK CASHING

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed:  March 28, 2025

Respectfully, I dissent. I would hold that the State of Maryland's sovereign immunity is not waived by Md. Code Ann., State Gov't (2014, 2021 Repl. Vol.) ("SG") § 12-201(a) in an action by a holder in due course under the Maryland Uniform Commercial Code ("MUCC"), Md. Code Ann., Com. Law (1975, 2013 Repl. Vol.) ("CL") § 3-203, for the payment of a check where the State has already satisfied its obligation to a payee and the payee has negotiated or transferred the check to a third party.

I part ways with the Majority's analysis in two respects. First, rather than examine the plain language and legislative history of SG § 12-201(a) to ascertain the intent of the General Assembly, the Majority's approach appears to be to demonstrate that a check can be "considered" or "deemed" a contract and conclude that because a check can be deemed a contract, the requirements of SG § 12-201(a) are satisfied. Maj. Slip Op. at 2. Second, in taking this approach, the Majority fails to grapple with the tenets of statutory construction in terms of concluding whether the provisions of SG § 12-201 are ambiguous and, if so, whether there is a clear expression of legislative intent to support its holding.

Applying well-settled principles of statutory construction, I would hold that the language of SG § 12-201(a) is unambiguous and does not apply to actions by holders in due course under CL § 3-203 seeking payment of checks issued by the State. SG § 12-201(a) provides that the State:

> may not raise the defense of sovereign immunity in a contract action, in a court of the State, based on a written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee.

By its plain language, SG § 12-201(a) prohibits the State from raising the defense of

sovereign immunity: (1) in a contract action, (2) based on a written contract, (3) that an official or employee executed for the State, and (4) where the official or employee was acting within the scope of the authority of the official or employee. SG § 12-201(a) does not refer to checks or define written contracts as checks, and there is no indication in the language of the statute that the General Assembly intended that actions brought by holders in due course be considered contract actions, that checks the State issues to its employees or others be "considered" or "deemed" written contracts for purposes of SG § 12-201(a), or that checks the State issues be deemed to have been executed by an official or employee acting within the scope of the person's duty for purposes of SG § 12-201(a). See Maj. Slip Op. at 2, 26. Although some sources have described a check as a type of contract, see, e.g., 22 *Williston on Contracts* § 60:1 (4th ed.); Restatement (Second) of Contracts § 6 (1981), there is no suggestion in the plain language of SG § 12-201(a) that the General Assembly intended to adopt such a definition or intended that an action by a holder in due course to enforce payment of a check be considered a written contract action for purposes of the statute.

Badlia Brothers, LLC d/b/a Southwest Check Cashing ("Badlia"), Respondent, argues, and the Majority agrees, that a check is a negotiable instruction, and negotiable instruments are formal contracts. See Maj. Slip Op. at 2. After extensive discussion about the meaning and definition of a check, the Majority concludes that a check can be considered a formal contract and that a check satisfies the requirement of a contract under SG § 12-201(a) because the General Assembly did not include language in the statute ruling out checks as contracts. See Maj. Slip Op. at 13, 18, 20. A plain language analysis

of SG § 12-201(a), however, involves examining the language of the statute to determine whether, by its ordinarily understood meaning, the phrase "a contract action . . . based on a written contract" would be understood to mean an action by a third-party holder in due course for payment of a check that the State has already paid.

In interpreting a statute, "[t]he cardinal rule of statutory construction is to ascertain and effectuate the intent of the General Assembly[,]" and "we look first to the language of the statute, giving it its natural and ordinary meaning." Amaya v. DGS Constr., LLC, 479 Md. 515, 540, 278 A.3d 1216, 1231 (2022) (cleaned up). "If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning," i.e., if there is no ambiguity, the Court gives "effect to the statute as it is written" and "the inquiry as to legislative intent ends." Id. at 540-41, 278 A.3d at 1231 (citation omitted); see also Koste v. Town of Oxford, 431 Md. 14, 26, 63 A.3d 582, 589 (2013) ("If the language of a statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends." (Cleaned up)). In the event of ambiguity, a court will carefully examine a "statute's legislative history, case law, purpose, structure, and overarching statutory scheme in aid of searching for the" General Assembly's intent. Koste, 41 Md. at 26, 63 A.3d at 589 (citation omitted).

In this case, in interpreting the language of SG § 12-201(a), the Majority does none of the above. Rather, in its brief analysis of SG § 12-201(a), the Majority simply states that a check can be deemed or considered a contract but does not conclude that based on the plain language of the statute the term "written contract" is unambiguous and the General Assembly intended a written contract to include a check issued by the State. See

- 3 -

Maj. Slip Op. at 13, 15, 18. Instead, the Majority concludes that, in SG § 12-201(a), the word "contract" is not limited to a bilateral contract and that "[t]here is no restriction in the text of § 12-201(a) to particular types or categories of written contracts, nor is it our place to add the phrase 'traditional bilateral' before 'contract' to restrict its unambiguous scope." Maj. Slip Op. at 20. Rather than examine the meaning of the language in the statute, the Majority conducts an analysis that exceeds an examination of the plain language of the statute, determines after research that a check is a formal contract, and concludes that because the General Assembly did not put limits on the word "contract," it intended the word to have a scope broad enough to include checks. This is not a plain language analysis. Using this approach, the language of any statute could be said to be unambiguous where the General Assembly did not limit the language at issue to rule out the interpretation in dispute. And, the Majority's approach exceeds, in the first place, a plain language analysis of the term "written contract," which would involve determining whether the meaning of the words is ordinarily understood to include a check.

Employing the traditional principles of statutory construction, I would conclude that the language of SG § 12-201(a) is unambiguous and does not include an action by a holder in due course to enforce payment of a check that the State has already paid. The statute provides by its plain language that the State may not raise a sovereign immunity defense in a contract action that is based on a written contract executed by a State official or employee where the official or employee was acting with the scope of the person's authority. The statute says what it means and means what it says. To the extent that there is any ambiguity, or, more specifically, to the extent that there is any remote possibility

- 4 -

that SG § 12-201(a) could be interpreted to mean that a check is a written contract and that an action by a holder in due course to enforce payment of a check that the State has already paid is a contract action for which the State may not raise the defense of sovereign immunity, this would be an absurd interpretation of the statute.

A "contract" is defined as "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law" and "[t]he writing that sets forth such an agreement[.]" *Contract*, Black's Law Dictionary (12th ed. 2024). Similarly, Merriam-Webster defines "contract" in part to mean "a binding agreement between two or more persons or parties[,] especially: one legally enforceable[,]" and "a document describing the terms of a contract[.]" *Contract*, Merriam-Webster (2025), https://www.merriam-webster.com/dictionary/contract [https://perma.cc/B9TC-V7Z5]. The word "action" is derived in part from an Anglo-Norman word meaning "the exercise of a claim before a judge[.]" *Action*, Black's Law Dictionary (12th ed. 2024). "Action" means "[a] civil or criminal judicial proceeding; esp[ecially,] lawsuit." Id. (cleaned up). "Action" has also been defined as "the initiating of a proceeding in a court of justice by which one demands or enforces one's right[.]" *Action*, Merriam-Webster (2025), https://www.merriam-webster.com/dictionary/action [https://perma.cc/R7M6-AL4S]. Reading the terms "contract" and "action" together, a contract action can be said to be a civil proceeding in a court arising out of an agreement creating obligations between two or more parties that is legally enforceable.

A "written contract" is defined as one "whose terms have been reduced to writing." *Written Contract*, Black's Law Dictionary (12th ed. 2024). Merriam-Webster defines

"written" as "made or done in writing[,]" such as "a written contract/agreement[.]" *Written*, Merriam-Webster (2025), https://www.merriam-webster.com/dictionary/written [https://perma.cc/MR5A-J4Q6]. Unlike a check, a written contract is a formal agreement that outlines the terms and conditions of the agreement, making the agreement enforceable in court. See, e.g., Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC, 376 Md. 157, 166, 829 A.2d 540, 546 (2003) ("Under the objective test of contract interpretation, the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." (Cleaned up)); see also Cochran v. Norkunas, 398 Md. 1, 14, 919 A.2d 700, 708 (2007) ("[M]anifestation of mutual assent is an essential prerequisite to the creation or formation of a contract . . . [and] includes two issues: (1) intent to be bound, and (2) definiteness of terms." (Citations omitted)). Written contracts clearly define the rights, responsibilities, and obligations of each party.[1]

As the Majority correctly points out:

> The law of negotiable instruments uses specific terms to describe the parties relevant to a particular instrument. With respect to checks, the "maker" of the check is the "person undertaking to pay" and the "drawer" is the "person ordering payment." [CL] § 3-103(a)(5), (3). A maker and a drawer, often the same person, can also be referred to as an "issuer." [CL] § 3-105(c).

---

[1]By contrast, a "check" is defined as "[a] draft, other than a document draft, signed by the drawer, payable on demand, drawn on a bank, and unconditionally negotiable." *Check*, Black's Law Dictionary (12th ed. 2024). "Check" is also defined as "a written order directing a bank to pay money as instructed[.]" *Check*, Merriam-Webster (2025), https://www.merriam-webster.com/dictionary/check [https://perma.cc/83TJ-CUS6]. In other words, the plain meaning of the word "check" is distinct from the common meanings of the word "contract" or "written contract."

Maj. Slip Op. at 8-9.  The language concerning a drawer, maker, or issuer of a check under CL §§ 3-103 and 3-105 is not synonymous with the language used in SG § 12-201(a) prohibiting the State from asserting the defense of sovereign immunity in a contract action based on a written contract that "an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee."

In addition to being inconsistent with the plain language of the statute, adopting the reasoning that a check is a written contract for purposes of SG § 12-201 is an illogical interpretation of the statute and violates basic principles of contract law.  Although a check is a negotiable instrument subject to the MUCC, it is not a written contract that memorializes an agreement and that consists of an offer, acceptance, and consideration between the parties, as is required by SG § 12-201(a).[2]  To be valid, a contract must contain all of the following elements: an offer, acceptance, and consideration; and a contract must be legally made.  See Cochran, 398 Md. at 23, 919 A.2d at 713 ("Creation of a contract requires an offer by one party and acceptance by the other party."  (Citations omitted)); Cheek v. United Healthcare of Mid-Atl., Inc., 378 Md. 139, 147, 835 A.2d 656, 661 (2003)

---

[2]To be sure, on brief in this case, the State, unfortunately, conceded that a check is a contract.  This is an ill-conceived concession that this Court should not rely on for a number of reasons.  First, there is no indication that SG § 12-201(a) applies to actions concerning negotiable instruments brought by holders in due course under CL § 3-203 of the MUCC.  Second, CL § 3-203 does not authorize a contract action based on a written check as described in SG § 12-201(a).  Rather, CL § 3-203 sets forth grounds on which a holder in due course of a negotiable instrument can recover if the holder in due course took a negotiable instrument in good faith and there was no fraud on the transferee's part.  CL § 3-203 does not set forth an action that sounds in contract.

("To be binding and enforceable, contracts ordinarily require consideration." (Citations omitted)). Consideration is the act of each party exchanging or promising to exchange something of value. See Chernick v. Chernick, 327 Md. 470, 479-80, 610 A.2d 770, 774 (1992) ("Consideration necessitates that 'a performance or a return promise must be bargained for.' A performance is bargained for if 'it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.'" (Quoting Restatement (Second) of Contracts § 71 (1981)). For a contract to be valid, both parties must provide consideration. See Cheek, 378 Md. at 148, 835 A.2d at 661 ("In Maryland, consideration may be established by showing a benefit to the promisor and a detriment to the promisee." (Cleaned up)). The Majority's interpretation of SG § 12-201(a), which appears to be that a check is a formal contract because it is negotiable instrument or a promise to pay an obligation, eliminates the requirement that a written contract be based on an offer, acceptance, and consideration, depriving the purported contract of necessary elements.

The Majority's analysis adds language to SG § 12-201(a) that does not exist and presupposes an intent that does not exist. SG § 12-201(a) does not state that the General Assembly has waived the State's sovereign immunity with respect to negotiable instruments executed by State officials that may be considered written contracts. Rather, SG § 12-201(a) applies to written contracts executed by State officials, which a check,

issued by the State, under any definition of a written contract, is not.[3]  Equally important, our precedent establishes that SG § 12-201(a) is to be strictly construed, for it sits in contravention of the common law.  See, e.g., Brawner Builders, Inc. v. State Highway Admin., 476 Md. 15, 32, 258 A.3d 217, 227 (2021) ("We have [] held that waivers of sovereign immunity, which are in derogation of common law, are strictly construed in favor of the State."  (Citations omitted)); Bd. of Educ. of Balt. City v. Zimmer-Rubert, 409 Md. 200, 212, 973 A.2d 233, 240 (2009) ("When considering waivers of sovereign immunity, this Court and [the Appellate Court of Maryland] have strictly construed such waivers in favor of the sovereign."  (Citations omitted)).  The Majority's analysis conflicts with this principle.

In addition to a check not complying with the definition of a written contract, there are restrictions on how long one has to cash a check that are significantly shorter than the general three-year statute of limitations that applies to most contract actions.  See Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl. Vol.) § 5-101 ("A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.").  Specifically, most checks must be cashed within six months.  See CL § 4-404 ("A bank is under no obligation to a customer having a checking account to pay a check, other than a

---

[3]A check is a negotiable instrument that is said to be a "formal contract," meaning that negotiable instruments require certain formal requirements to be satisfied, like the statutory conditions concerning negotiability in CL § 3-104 (defining "negotiable instrument").  Under this definition, a check, although a negotiable instrument, is not a written contract.

- 9 -

certified check, which is presented more than six months after its date[.]").  All of this shows that the Majority's determination fails to comport with a plain language analysis and reaches an illogical result.

Although the language of SG § 12-201(a) is not ambiguous and one need not look beyond the language of the statute to ascertain the General Assembly's intent, were further inquiry into the General Assembly's intent necessary, it is clear that, in enacting the statute, the General Assembly's purpose was, among other things, to ensure that State did not raise the defense of sovereign immunity in contract actions involving written contracts that were properly executed by its officials or employees.  The legislative history of the statute is devoid of any intent by the General Assembly that the State relinquish the defense of sovereign immunity in instances in which holders in due course seek payment for checks where the State has already satisfied its obligation to a payee.

In discussing the legislative history of SG § 12-201, the Majority states that "[t]he purpose of [SG] § 12-201(a) was to codify the moral obligation on the part of any contracting party, including the State or its political subdivisions, to fulfill the obligations of a contract."  Maj. Slip Op. at 22 (cleaned up).  This language provides no support for the Majority's holding.  First, it is only good common sense that the State of Maryland would want to honor its obligations, *i.e.*, a statement to this effect is not indicative of a clear expression on the State's part that it has waived sovereign immunity under SG § 12-201(a) for payment of checks to holders in due course.  Next, under the circumstances of this case, the State has already satisfied its moral obligation and rendered the payment it promised to make, *i.e.*, the intended payee has received the contemplated payment.

Badlia argues that the holding of the Supreme Court of Texas in ½ Price Checks Cashed v. United Auto. Ins. Co., 344 S.W.3d 378, 386 (Tex. 2011), that the drawer of a check enters into a contract to pay the payee and a subsequent holder in due course, informs the outcome of this case. Citing ½ Price Checks Cashed as an example, the Majority states that "[t]he long-standing view that a check, as a negotiable instrument, is a contract has been recognized by numerous state courts for more than a century." Maj. Slip Op. at 14 (footnote omitted). In the Texas case, a check cashier filed suit for breach of contract against the drawer of a dishonored check. See ½ Price Checks Cashed, 344 S.W.3d at 381. And, the Supreme Court of Texas stated: "It is settled law that a check—as a type of negotiable instrument—is a formal contract, a rule established not only in treatises but also the common law of this state and other states." Id. at 383-84 (footnotes omitted). Citing Section 3.414 of the Texas Business and Commercial Code, which is similar to CL § 3-414, the Supreme Court of Texas held: "The drawer of a check has a clear obligation to pay the holder of a dishonored check under section 3.414." ½ Price Checks Cashed, 344 S.W.3d at 384. This is an accurate recitation of the Court's holding, but this does not mean that the Maryland General Assembly has waived the State's sovereign immunity with respect to checks issued by the State that have been transferred to third party holders in due course where the third party seeks payment after the original payee has already been paid.

Under the circumstances of this case, and others like it, in which the State has satisfied its obligation and paid the payee, in the absence of a waiver of the State's sovereign immunity, Badlia has a remedy. Badlia and others who are similarly situated may institute an action against the payee who is responsible for the fraud. For example, in

the event that a person wrote a check as a gift to a relative and the relative cashed the check, but also negotiated or transferred the check to a third party, the third party would have an action against the relative who transferred the check to the third party after having already cashed it. To conclude otherwise would be absurd. The maker of the check would not have a moral obligation to pay the third party, where the relative had already cashed the check.

Badlia makes the point that if third parties have no recourse with the State, they will not want to do business with the State and will not accept assignment of State contracts and obligations. But this case does not involve the assignment of a contract or an assignee bringing a contractual action based on an assignment. While Badlia is concerned that holding that SG § 12-201(a) does not provide for a contractual action will result in a chilling effect on people's willingness to do business with the State, the real concern is that the Majority's holding will embolden fraudulent transfers of State checks, like those that occurred in this case. Equally concerning is the prospect that the Majority's holding will drive up costs to the State, as the State will be obligated to pay checks twice and bring an action against its bank for having negligently or erroneously paid the check a second time to a holder in due course.

For the above reasons, respectfully, I dissent.